**WO**                                                                 JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andrew Francis Babcock, | No. CV 22-00418-TUC-SHR |
| Plaintiff, | |
| v. | **ORDER** |
| United States of America, et al. | |
| Defendants. | |

    Plaintiff Andrew Francis Babcock, who is confined in the United States Penitentiary in Tucson, Arizona (USP-Tucson), brought this pro se civil rights action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), against the United States. (Doc. 11.) Before the Court is Defendant's Motion for Summary Judgment. (Doc. 51.) The Court will grant Defendant's Motion and terminate the action.

**I.    Background**

    In his Second Amended Complaint, Plaintiff alleged USP-Tucson employees delayed emergency treatment for his finger after he smashed it while working with food service carts. (Doc. 11 at 3.) Plaintiff alleged his finger had to be amputated due to delays in emergency care and follow up care and a denial of surgery, and he is permanently disfigured. (*Id.* at 3, 16.) On screening, the Court determined Plaintiff had sufficiently stated an FTCA claim against Defendant. (Doc. 12.)

    On January 6, 2025, Defendant filed a Motion for Summary Judgment, arguing Plaintiff cannot show a breach in the standard of care or that any alleged breach

proximately caused his injury. (Doc. 51.)

Upon the filing of Defendant's Motion, the Court issued a Notice pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), informing Plaintiff of his right and obligation to respond. (Doc. 58.) Plaintiff failed to file a response, and the time to do so has expired. Therefore, in its analysis, the Court will construe Plaintiff's verified Second Amended Complaint (Doc. 11) as an affidavit in opposition to the summary judgment motion. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence).

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not conclusively establish a material issue of fact in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however,

it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Where the nonmovant is a pro se litigant, the court must consider as evidence in opposition to summary judgment all of the nonmovant's contentions set forth in a verified complaint or motion. *Jones*, 393 F.3d at 923.

### III. Relevant Facts

Plaintiff's claim arose at USP-Tucson on February 18, 2021, when he was working his kitchen job. (Doc. 11 at 1, 3; Doc. 52-1 at 15, Pl. Dep. 14:9, July 3, 2024.) Plaintiff was moving a food service cart at the direction of the food service administrator, Mrs. Brown, when another cart crashed into the cart Plaintiff was holding and crushed Plaintiff's right ring and pinky fingers. (Doc. 11 at 3; Doc. 52-1 at 11, Pl. Dep. 10:13–12:23.) The tip of Plaintiff's ring finger was hanging by thin skin fibers, and Plaintiff began bleeding all over the floor. (Doc. 11 at 3; Doc. 52-1 at 17, Pl. Dep. 16:13–14.)

Plaintiff immediately approached the Correctional Officer (CO) who was in the corridor with Plaintiff and showed the CO his hand. (Doc. 52-1 at 17, Pl. Dep. 16:9–10.) The CO directed Plaintiff to go to the medical unit. (*Id.* 16:10–11.) Plaintiff went to the medical unit, but the door was locked, and no one was there. (*Id.* 16:11–12.) Plaintiff returned to the CO, who then radioed medical staff. (*Id.* 16:12–15.) Medical staff responded they were at the other units. (*Id.* 16:15.) At this time, the whole compound was locked down due to COVID-19, so medical staff had to go to each unit to hand out

1  medication. (*Id.* 16:13–16.) Plaintiff had to wait approximately 15 minutes for medical
2  staff to show up. (Doc. 11 at 11.)

3        Around 12:30 p.m., Plaintiff was seen by Physician Assistant (PA) Christy
4  Newland. (Doc. 54 at 57.) Newland noted Plaintiff's 4th digit tip had multiple lacerations
5  with the tip appearing to be almost completely separated from the rest of the finger. (*Id.* at
6  58.) Plaintiff reported throbbing pain and no feeling in his right 4th digit fingertip. (*Id.* at
7  57–58.) Newland assessed Plaintiff's injury as a "[c]rushing injury of . . . hand and
8  fingers" and submitted a consultation request for emergency room (ER) treatment. (*Id.* at
9  58.) Newland requested Plaintiff be taken to the ER within 2 hours if possible. (*Id.* at 59.)
10 Newland cleaned and bandaged Plaintiff's finger and told Plaintiff she would get the
11 paperwork going to send him to the ER. (*Id.*; Doc. 11 at 11.)

12       Plaintiff was taken to Tucson Medical Center and x-rayed around 3:15 p.m. (Doc.
13 54 at 125.) The x-ray report findings were "amputation type injury" involving the "right
14 fourth digit distal tuft" with a "comminuted fracture" with "diffuse soft tissue injury." (*Id.*
15 at 125, 134, 137.) The emergency room provider applied sutures to Plaintiff's finger and
16 dressed the wound. (*Id.* at 133.) The emergency room provider prescribed antibiotics,
17 ibuprofen, and Tramadol (pain medication) and recommended follow up with a hand
18 specialist. (*Id.* at 135–136, 140–141.)

19       On February 25, 2021, Plaintiff saw the hand surgeon, Dr. David Margolis, at
20 Banner Health. (*Id.* at 118.) Dr. Margolis performed an exam and reviewed the emergency
21 room record, and another scan was performed. (*Id.* at 118–120.) Dr. Margolis assessed
22 "[f]racture of distal phalanx of right ring finger" and finger necrosis (gangrene). (*Id.* at
23 119.) The plan was to proceed with surgical debridement and revision amputation. (*Id.* at
24 118.)

25       On February 28, 2021, Plaintiff saw Nurse Avilez for continued pain after his finger
26 injury. (*Id.* at 45.) Avilez administered one dose of oxycodone pursuant to an order by the
27 on-call provider. (*Id.*)

28

- 4 -

On March 4, 2021, Plaintiff saw PA Newland for throbbing pain in his finger. (*Id.* at 42.) Newland noted Plaintiff had seen the hand surgeon on February 25, 2021. (*Id.*) Newland prescribed oxycodone for three days. (*Id.*) Later that day, Dr. Haight-Biehler entered an administrative note in the medical record documenting the recommendation from the hand surgeon for revision/debridement amputation of Plaintiff's fingertip. (*Id.* at 41.) Dr. Haight-Biehler submitted a consultation request for hand surgery with a "target date" of March 8, 2021, and he indicated the priority status was "urgent." (*Id.*)

On March 6, 2021, Plaintiff saw Nurse Cosme for a pain management follow up. (Doc. 54 at 23.) Plaintiff reported throbbing pain in his finger at a scale of 8/10. (*Id.*) Later that day, Dr. Haight-Biehler entered an administrative note into the medical record noting Plaintiff's nurse encounter and his pain scale had been reviewed. (*Id.* at 22.) Dr. Haight-Biehler documented "[c]hronic unrelenting pain that will last somewhat beyond the scheduled surgery" and entered a prescription for oxycodone for 30 days. (*Id.*)

On March 8, 2021, Plaintiff saw NP Bulger for complaints of throbbing pain at a scale of 8/10. (*Id.* at 37.) NP Bulger noted Plaintiff had traumatic injury to the right-hand 4th distal fingertip and Plaintiff was "pending Hand surgery procedure to remove necrotic tissue and place skin graft over tip of finger." (*Id.*) Plaintiff reported he still had a lot of pain and had not received his pain medication consistently. (*Id.*) NP Bulger renewed the prescription for oxycodone for three days. (*Id.* at 38.)

On March 10, 2021, Dr. Haight-Biehler ordered a pre-operation COVID test for Plaintiff, noting the "must be done on" March 25, 2021. (*Id.* at 36.)

On the morning of March 11, 2021, Dr. Haight-Biehler entered an administrative note in the medical record documenting a consultation request for hand surgery with a "target date" of March 17, 2021, and he indicated the priority status was "routine." (*Id.* at 35.) Later that day, Plaintiff saw Nurse Stone and reported throbbing pain in his finger. (*Id.* at 32.) Immediately after this encounter, Dr. Haight-Biehler entered an administrative note in the medical record documenting that Plaintiff "continues with pain after crush

1  injury and amputation of fingertip," and a prescription of oxycodone was ordered for three
2  days. (*Id.* at 31.)
3    On March 12, 2021, NP Bulger entered an administrative note in the medical record
4  stating "renewal of pain medication while IM [inmate] pending Hand surgery f/u. Inmate
5  still rates pain at 7–8/10." (*Id.* at 29.)
6    On March 19, 2021, Plaintiff saw PA Newland for extreme pain in his right hand.
7  (*Id.* at 18.) Newland documented Plaintiff was "awaiting surgery to remove necrotic tissue
8  from Right hand, 4th finger." (*Id.*) Newland prescribed oxycodone for pain. (*Id.* at 19.)
9    On March 26, 2021, a specimen was collected for a COVID test, which was
10 negative. (Doc. 54 at 107.)
11   Approximately five weeks after the February 25, 2021 appointment with Dr.
12 Margolis, Plaintiff had not heard anything about the recommended surgery, and medical
13 staff repeatedly told him he had to wait. (Doc. 52-1 at 26, Pl. Dep. 25:19–21.) Because
14 Plaintiff's fingertip was gangrenous, he took a razor blade and cut the tip of his ring finger
15 off himself, and then he took care of the finger himself to get it to heal. (*Id.*, 25:12–21.)
16   On March 31, 2021, Plaintiff was evaluated by Dr. Margolis in the preoperative
17 holding area at Banner Health. (Doc. 54 at 115.) Dr. Margolis documented Plaintiff's
18 "wound has significantly improved at this point and no longer needs surgery. We will see
19 him in clinic." (*Id.*)
20   On April 2, 2021, Plaintiff was seen by PA Newland for pain in his right 4th finger.
21 (*Id.* at 12.) Newland noted Plaintiff's finger was mildly swollen and there was still an open
22 wound on the tip, but it appeared to be healing and no amputation was done at this point.
23 (*Id.*) Newland prescribed oxycodone for pain and submitted a consult request for
24 occupational therapy. (*Id.* at 13.)
25   On April 15, 2021, Plaintiff saw surgeon Dr. Margolis at Banner Health. (*Id.* at
26 111.) Dr. Margolis documented Plaintiff's wound was "well healed and no longer requires
27 surgical debridement." (*Id.*) Dr. Margolis told Plaintiff his fracture had healed, treatment
28

options for Plaintiff's finger included massage, and the plan was to continue with conservative management. (*Id.*)

## IV. FTCA

Under the FTCA, a plaintiff may bring a claim in federal court against the United States

> for injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (emphasis added).

The FTCA authorizes tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Because there is no general civil tort law applicable to the United States, liability for the tort of an individual, such as medical malpractice, is determined under state law. *Mann v. United States*, No. CV-11-8018-PCT-LOA, 2012 WL 273690, at *5 (D. Ariz. Jan. 31, 2012) (citing *Young v. United States*, 71 F.3d 1238, 1242 (6th Cir. 1995). Accordingly, to recover under the FTCA, a plaintiff "must show the government's actions, if committed by a private party, would constitute a tort" under state law. *Love v. United States*, 60 F.3d 642, 644 (9th Cir. 1995).

## V. Discussion

### A. Medical Negligence Standard

Plaintiff's injury occurred in Arizona. Under Arizona law, to support a medical negligence claim, the plaintiff must show (1) the "health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs" and (2) "[s]uch failure was the proximate cause of the injury." Ariz. Rev. Stat. § 12-563 (2003).

The "yardstick" by which a healthcare provider's compliance with his duty is measured is commonly referred to as the "standard of care." *Seisinger v. Siebel*, 203 P.3d

483, 492 (Ariz. 2009) (citation omitted). To maintain a medical tort claim, a plaintiff must present evidence showing the healthcare provider fell below the applicable standard of care and the deviation from the standard of care proximately caused the claimed injury. *Ryan v. S.F. Peaks Trucking Co., Inc.*, 262 P.3d 863, 869–70 (Ariz. Ct. App. 2011) (citing Ariz. Rev. Stat. § 12-563). "The standard of care must be established by specific evidence. It cannot rest upon conjecture or inference." *Valencia v. United States*, 819 F. Supp. 1446, 1463–64 (D. Ariz. 1993) (internal citations omitted). In addition, "[u]nless malpractice is grossly apparent, the standard of care must be established by expert medical testimony." *Rasor v. Northwest Hosp., LLC*, 403 P.3d 572, 575 (Ariz. 2017); *see Seisinger*, 203 P.3d at 492 ("Arizona courts have long held that the standard of care normally must be established by expert medical testimony."). Expert medical testimony is also required to establish proximate cause. *See Rae v. United States*, No. CV-15-01551-PHX-JJT, 2016 WL 4943378, at *5 (D. Ariz. Sept. 16, 2016) (citing *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 231 P.3d 946, 951 (Ariz. Ct. App. 2010).

**B.  Analysis**

In his deposition, Plaintiff clarified his FTCA claim rests on the alleged negligence of PA Newland and Dr. Haight-Biehler. (Doc. 52-1 at 20, 24, Pl. Dep. 19:14–18, 23:16–23.)

Defendant argues Plaintiff cannot prove a breach in the standard of care by either BOP provider because he did not disclose expert witnesses to testify on the standard of care for PA Newland and Dr. Haight-Biehler, nor is Plaintiff qualified to offer testimony on the issue. (Doc. 51 at 7–8.) Plaintiff admitted he does not have any expert reports or sworn statements to establish the standard of care or that PA Newland's or Dr. Haight-Biehler's care fell below the standard of care. (Doc. 52-1 at 36, Pl. Dep. 35:20–24.) Thus, Plaintiff cannot meet his burden of proof in this case, and summary judgment is appropriate unless the negligence alleged is so obvious a layman would easily recognize it. *Rasor*, 403 P.3d at 575.

Plaintiff alleges PA Newland and Dr. Haight-Biehler committed medical malpractice by (1) delaying emergency treatment following his February 18, 2021 injury, and (2) failing to timely return Plaintiff to the hospital for hand surgery. (Doc. 11 at 3, 16, 22; Doc. 52-1 at 20, 24, Pl. Dep. 19:14–20:3, 23:6–23.)

The determination as to whether the 3-hour period between Plaintiff's injury and his transport to the ER worsened Plaintiff's injury or caused him harm he would not otherwise have suffered if he had arrived at the ER earlier is not the type of determination a layperson can make without an expert report regarding the type of injury suffered by Plaintiff. Similarly, the determination as to whether the delay in returning Plaintiff for surgery caused his condition to worsen is not within the common understanding of a layperson. Although Plaintiff chose to self-amputate instead of waiting for his upcoming surgery, it is not clear from the sparse facts presented that he was forced to do so to relieve his pain, which was being treated with oxycodone. Nor can his choice to do so, even if it caused him more pain temporarily, be attributed to the actions of his onsite medical providers. Moreover, when Plaintiff was taken to surgery, the surgeon found his wound was well-healed and no longer required surgery, so Plaintiff cannot establish the delay in surgery caused him further injury.

This case differs greatly from cases where courts have found negligence so grossly apparent and obvious that a layperson would recognize it. *See Cobler v. United States*, No. CV 19-00348-TUC-RM, 2022 WL 625710, at *6 (D. Ariz. Jan. 12, 2022) (finding it would be obvious to a layperson emergency treatment was needed for symptoms of severe stomach pain and vomiting blood repeatedly); *Reidhead v. Arizona*, No. CV-12-0089-PHX-JAT, 2014 WL 2861046, at *6 (D. Ariz. June 24, 2014) (finding expert testimony as to a nurse's standard of care not required to show negligence because a reasonable jury could conclude any employee presented with the plaintiff's symptoms of a heart attack had a duty to seek medical help and the nurse breached that duty); *Carranza v. Tucson Med. Ctr.*, 662 P.2d 455, 456–57 (Ariz. Ct. App. 1983) (concluding expert testimony was not

required to show a burn on child's leg sustained during heart surgery could not have occurred without negligence because it was within the realm of common knowledge).

Because Plaintiff's allegations do not amount to obvious negligence recognizable to a layperson, Plaintiff would require expert medical testimony to establish the standard of care and any breach of that standard of care. Thus, Defendant is entitled to summary judgment due to Plaintiff's failure to disclose a medical expert.

**IT IS ORDERED:**

(1) Defendant United States' Motion for Summary Judgment (Doc. 51) is **granted**.

(2) The Clerk of Court must enter judgment accordingly and terminate this action.

Dated this 30th day of June, 2025.

Honorable Scott H. Rash
United States District Judge